Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| | | |
|---|---|---|
| CONSEJO DE TITULARES DEL COND. VILLAS DEL MAR BEACH RESORT<br><br>Apelado<br><br>V.<br><br>MULTINATIONAL INSURANCE COMPANY<br><br>Apelante | TA2026AP00106 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Carolina<br><br>Caso Núm.: LO2020CV00007<br><br>Sobre: Incumplimiento de Contrato |

Panel integrado por su presidenta; la Juez Lebrón Nieves, el Juez Pagán Ocasio y la Jueza Álvarez Esnard

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 30 de junio de 2026.

El 29 de enero de 2026, compareció ante este Tribunal de Apelaciones Multinational Insurance Company (en adelante, Multinational o parte apelante), mediante recurso de *Apelación.* Por medio de este, nos solicita que revisemos la *Sentencia* emitida el 29 de diciembre de 2025 y notificada el 30 de diciembre de 2025, por el Tribunal de Primera Instancia, Sala Superior de Carolina. En virtud del aludido dictamen, el foro *a quo* adoptó las determinaciones de hecho, así como las recomendaciones de pago según expuestas por el Comisionado Especial en su Informe Final.

Por los fundamentos que adelante se esbozan, se revoca la *Sentencia* apelada y se devuelve el caso al foro primario para la continuación de los procedimientos de los procedimientos de conformidad con lo aquí resuelto, y se efectúe la valoración de los daños reclamados por la parte apelada, de conformidad con lo dispuesto en la Póliza de seguro contratada por las partes. Asimismo, se eliminan las cuantías por concepto de honorarios de abogado por temeridad y el pago de intereses por mora.

**I**

Los hechos que suscitaron la controversia de epígrafe se remontan a una *Demanda* sobre incumplimiento de contrato de seguros, y daños y perjuicios, instada el 21 de enero de 2020, por el Consejo de Titulares en contra de Multinational. En esencia, la parte apelada, entre otras cosas, solicitó el cumplimiento específico del contrato de seguros suscrito entre el Consejo de Titulares (en adelante, el Consejo o parte apelada) y Multinational. Explicó que, Multinational había expedido la póliza de seguros número 88-CP-000320670-1 (en adelante, Póliza), a favor del Condominio Villas del Mar (en adelante, el Condominio). Dicha Póliza cubría el periodo de 28 de febrero de 2017 a 28 de febrero de 2018. Según la parte apelada, la cubierta de la Póliza incluía todos los edificios y otras estructuras que pudieran sufrir daños hasta un total de $23,816,745.00. Asimismo, alegó que cubría daños a la propiedad causados por viento e inundaciones, y contenía un *"Windstorm Deductible"* para daños ocasionados por el viento, que estaba sujeto a un deducible de 2% del valor de la propiedad. En su *Demanda*, la parte apelada arguyó que, debido al paso del huracán María en septiembre de 2017, el Condominio sufrió daños en el techo, ventanas, estructura del edificio, espacios interiores y estructuras auxiliares. Tras lo anterior, la parte apelada presentó una reclamación ante Multinational[1], donde solicitó que los daños ocasionados por el huracán María fueran cubiertos de acuerdo a los términos de la Póliza. Según alegado en la *Demanda*, Multinational no fue diligente con el trámite de la reclamación, pese a haberle presentado varios estimados donde se documentaban los daños a la propiedad y habérsele requerido el pago de los costos de reparación a la misma, según la Póliza. La parte apelada afirmó que, más

---

[1] Número de reclamación 317405.

adelante, Multinational atendió la reclamación. No obstante, adujo que llevó a cabo una investigación inadecuada donde evaluó de forma errónea los daños de la propiedad en cuestión. Añadió que, Multinational le ofreció una cantidad menor a la solicitada. De igual manera, la parte apelada acotó que, Multinational se negó a emitir el pago de los daños cubiertos y consecuentemente, no había podido reparar la propiedad. Por lo anterior, le solicitó al foro primario que: 1) determinara que Multinational incumplió con el contrato y que actuó de mala fe; 2) ordenara a Multinational a pagarle una cantidad no menor de $12,500,000.00 como compensación por los daños ocasionados por el huracán María en la propiedad; 3) le ordenara a Multinational a pagarle una cantidad no menor de $1,250,000.00 a la parte apelada en concepto de daños ocasionados por la parte apelante al incumplir con la Póliza y violentar el Código de Seguros de Puerto Rico, y finalmente, 4) le ordenara a la parte apelante el pago de costas y honorarios.

El 23 de enero de 2020, la parte apelada interpuso *Moción Sometiendo Emplazamiento Diligenciado* en la que evidenció el haber emplazado a la parte apelante el 22 de enero de 2020.

El 24 de febrero de 2020, la parte apelante presentó *Moción para Asumir Representación Legal y en Solicitud de Prórroga para Contestar o de Otra Forma Alegar* y *Moción para Unirse a Representación Legal.*

Posteriormente, mediante las Resoluciones EM-2020-03, EM-2020-05, EM-2020-07, EM-2020-10, y EM-2020-12 emitidas por el Tribunal Supremo de Puerto Rico el 26 de marzo de 2020, los términos que vencían entre el lunes 16 de marzo y el martes 14 de julio quedaron extendidos hasta el 15 de julio de 2020.

Transcurridas varias incidencias procesales, innecesarias pormenorizar, la parte apelante presentó *Contestación a Demanda.* En resumen, negó las alegaciones de la *Demanda* y afirmó haber

cumplido a cabalidad con sus obligaciones. Añadió que, algunos de los daños reclamados en la *Demanda* fueron exponencialmente sobrevalorados, especulativos, exagerados y preexistentes. Consecuentemente, solicitó al foro primario que declarara sin lugar la reclamación de epígrafe y le impusiera a la parte apelada el pago de costas, gastos y honorarios de abogados.

El 12 de junio de 2020, aun sin haber vencido el término de la paralización, la parte apelada presentó *Moción Solicitando Que Se Ordene a Mapfre a Contestar la Demanda y el Descubrimiento de Prueba.* De este modo, peticionó al foro primario que ejerciera su autoridad para dictar los procedimientos del caso y ordenara a Multinational Insurance Company ("Multinational") responder a la *Demanda* dentro de un término final de diez (10) días y a contestar el Primer Pliego de Interrogatorios y Requerimiento de Producción de Documentos cursado por el Consejo, dentro de quince (15) días, contados a partir de su contestación a la demanda.

Con relación a la precitada moción, mediante *Orden* del 29 de junio de 2020, el TPI ordenó a Multinational contestar la *Demanda* en o antes del 15 de julio de 2020. Asimismo, le ordenó contestar el *Primer Pliego de Interrogatorios y Requerimiento de Producción de Documentos*, cursados por el Consejo dentro de los quince (15) días, contados a partir de la *Contestación de la Demanda.*

Mediante *Moción en Solicitud de Desestimación Parcial* presentada el 3 de julio de 2020, Multinational solicitó al Tribunal que desestimara la primera causa de acción sobre incumplimiento de contrato en virtud de los artículos 1054 y 1077 del Código Civil de Puerto Rico, contenida en la *Demanda*. Arguyó que, en virtud de Ley 247-2018, la parte apelada estaba impedida de reclamar por alegadas violaciones al Código de Seguros de Puerto Rico y a la misma vez, bajo las disposiciones generales referente a materia de

contratos, según contempladas en el Código Civil de Puerto Rico, 31 LPRA §1, et seq.

El 7 de julio de 2020, el foro *a quo* emitió *Orden Inicial* en *Casos de Reclamaciones Relacionadas a los Huracanes Irma y María*. En esa misma fecha, le concedió al Consejo el término de 20 días para expresarse con relación a la moción de desestimación interpuesta por Multinational.

Mediante *Moción en Cumplimiento de Orden* presentada el 27 de julio de 2020, Multinational informó que, en virtud de la Orden Inicial emitida por el Tribunal el 6 de julio de 2020, produjo al Consejo la información y documentación relacionada con el descubrimiento de prueba uniforme y automático.

Ese mismo día, el Consejo hizo lo propio y presentó *Moción Informando Cumplimiento de Orden Sobre Intercambio de Documentos*, en la que informó que mediante carta suscrita el 24 de julio de 2020, le produjo la información requerida por dicha *Orden* a Multinational. Asimismo, en la misma carta, incluyó un enlace para que Multinational pudiera descargar la producción de documentos que, según adujo, contenía 11,804 páginas.[2] Atendida la aludida moción, el foro primario emitió *Orden* en la que declaró la misma Ha Lugar y dio por cumplida la *Orden* del 6 de julio de 2020.

El 30 de julio de 2020, el foro primario dictó *Sentencia Parcial*, mediante la cual concluyó que la intención y política pública de la Asamblea Legislativa era que la Ley 242-2018 tuviese un efecto prospectivo. Por lo cual, desestimó con perjuicio, las causas de acción dimanantes de las causales creadas por la Ley 247–2018, por dejar de exponer una reclamación que justificara la concesión de un remedio. El Tribunal determinó expresamente que no existía razón

---

[2] Cabe destacar que, según afirmó la parte apelante, el Consejo no se incluyó ni el Aviso ni la Reclamación Inicial alegadamente hecha como parte de la prueba documental que le fue cursada. Añadió que, por el contrario, en el acápite de la Prueba requerida por la parte demandante, el Consejo solicitó Copia del expediente completo de la reclamación *(Claim file)*.

para posponer el que se dictara Sentencia Parcial hasta la resolución total del pleito y ordenó que se registrara y notificara la misma, a tenor con lo provisto en la Regla 42.3 de Procedimiento Civil.[3]

Subsiguientemente, el 31 de julio de 2020, Multinational interpuso ante el foro *a quo* su alegación responsiva.

El 14 de agosto de 2020, el Consejo presentó *Moción de Reconsideración* respecto a la Sentencia Parcial del 30 de julio de 2020.

Así las cosas, el 17 de agosto de 2020 las partes presentaron de manera conjunta, el Informe para el Manejo del Caso.

Entre otras incidencias procesales, el 21 de septiembre de 2020 el foro primario dictó *Sentencia Parcial Nunc Pro Tunc*.

El 24 de septiembre de 2020, el Consejo presentó *Moción de Reconsideración de Sentencia Parcial Nunc Pro Tunc.* En esencia, el Consejo arguyó que, el Tribunal discutió e interpretó la Ley 242-2018, en lugar de la Ley 247-2018, para propósitos de analizar la retroactividad de ésta última. Reiteró que, la segunda causa de acción de la Demanda surge del Artículo 27.164 del Código de Seguros, el cual fue añadido por la Ley 247 y codificado en 26 LPRA § 2716d. Asimismo, alegó que el Tribunal se equivocó al concluir que el Consejo sustentaba sus alegaciones en la Ley 242 y que dicha ley no aplica a pólizas emitidas con anterioridad a su aprobación.

Mediante Resolución emitida el 5 de octubre de 2020, el foro *a quo* declaró No Ha Lugar a la *Moción de Reconsideración de Sentencia Parcial Nunc Pro Tunc.* Consecuentemente, confirmó la Sentencia Parcial de 30 de julio de 2020, enmendada *nunc pro tunc* el 14 de septiembre de 2020 y ordenó la continuación de los procedimientos. Asimismo, reiteró el señalamiento de la Vista de Conferencia Inicial de 21 de octubre de 2020.

---

[3] 32 LPRA AP. V.

Tras los trámites procesales antes esbozados, las partes estuvieron envueltas activamente en el descubrimiento de prueba.

Con posterioridad, el 12 de noviembre de 2020, el Consejo le informó al Tribunal de Primera Instancia que había comparecido ante este foro revisor mediante recurso de Apelación, en el cual impugnó la desestimación parcial dictaminada por el foro primario. En consideración al aludido trámite apelativo, el 15 de noviembre de 2020, la Juzgadora de instancia emitió *Resolución* en la cual decretó lo siguiente: "Enterada de que el Consejo presentó una Apelación Civil ante el Tribunal de Apelaciones de Puerto Rico, Caso Núm. KLAN 202000897, a través de la cual solicitan la revisión de la *Sentencia Parcial Enmendada Nunc Pro Tunc*. Se ordena la paralización de los procedimientos hasta tanto el Tribunal Apelativo atienda el recurso presentado. Se deja sin efecto vista de 18 de noviembre de 2020, a las 2:30 pm. Tome nota Secretaría."

Inconforme con dicha determinación, la parte apelAda solicitó reconsideración. El 2 de febrero de 2021, el foro primario dispuso que: "Atendida la *Moción de Reconsideración Solicitando que se Deje Sin Efecto la Paralización de los Procedimientos* presentada el 30 de noviembre de 2020 por los demandantes a través de sus representantes legales, la *Oposición a Moción de Reconsideración Solicitando que se Deje Sin Efecto la Paralización de los Procedimientos* presentada el 26 de diciembre de 2020 por los demandados, a través de sus representantes legales, la *Réplica a Oposición a Moción de Reconsideración Solicitando que se Deje Sin Efecto la Paralización de los Procedimientos* presentada el 8 de enero de 2021 por los demandantes a través de sus representantes legales, este Tribunal determina lo siguiente: No Ha Lugar a *Moción de Reconsideración Solicitando que se Deje Sin Efecto la Paralización de los Procedimientos*. Por economía procesal, se confirma Orden de Paralización de 15 de noviembre de 2020, decretando la paralización

de los procedimientos mientras el Tribunal de Apelaciones atiende el recurso de Apelación."

El 29 de enero de 2021, un Panel Hermano de este Tribunal emitió Sentencia mediante la cual confirmó el dictamen del foro *a quo*. El Mandato correspondiente fue emitido el 6 de mayo de 2021.

Acaecidas varias incidencias procesales, innecesarias pormenorizar, el 22 de junio de 2021, a instancias del foro *a quo* durante la vista sobre el estado de los procedimientos celebrada el 15 de junio de 2021, el Consejo presentó *Moción Informativa sobre Solicitud de Adelanto*. Arguyó que, luego de analizar los hechos particulares de este caso y las decisiones recientes del Tribunal de Apelaciones, confirmadas por el Tribunal Supremo al denegar la expedición de los recursos de certiorari presentados por la aseguradora en dichos casos, estaría presentando una moción de sentencia sumaria parcial solicitando el pago de un adelanto sobre el restante de la cuantía del estimado ajustado que fue retenida por Multinational. Para ello, solicitó un breve término adicional.

El 25 de junio de 2021, el Consejo presentó una *Moción de Sentencia Sumaria Parcial*, en la cual solicitó que se ordenara a Multinational a pagarle al Consejo la suma de $192,654.28 (sujeto a la deducción del pago de adelanto previo de $82,814.25), reconocida en el ajuste emitido por Multinational el 2 de julio de 2019.

El 28 de julio de 2021, Multinational presentó su *Oposición a Moción de Sentencia Sumaria Parcial*. Examinados los respectivos escritos de las partes, el 27 de agosto de 2021, notificada el 29 de agosto, la primera instancia judicial emitió *Resolución y Orden* mediante la cual, entre otras cosas, le ordenó a la parte apelante a pagar inmediatamente a la parte apelada el mínimo que la primera había reconocido que su asegurada tenía derecho a recibir. Es decir, la suma de $109,840.03 por concepto del adelanto de cuantías que

no estaban en disputa. Por igual, ordenó la continuación de los procedimientos en cuanto a las cuantías adicionales a las que entendiera la parte apelada tenía derecho a recibir.

El 17 de septiembre de 2021, la parte apelada interpuso ante el foro primario *Moción de Desacato y en Solicitud de Orden* mediante la cual peticionó que se declarara a la parte apelante incursa en desacato por desobedecer la *Resolución y Orden* de 27 de agosto de 2021, y se le ordenara pagar al Consejo, en un término perentorio de tres días laborables, hasta el 22 de septiembre de 2021, la cuantía de $109,840.03.

El 22 de septiembre de 2021, la parte apelante mediante *Moción Informativa*, puso en conocimiento al Tribunal de Primera Instancia de la presentación de una *Solicitud de Certiorari* ante este foro revisor. En esta solicitó la revisión de la "*Resolución y Orden*" del 27 de agosto de 2021, mediante la cual el foro *a quo* declaró "ha lugar" una Moción de Sentencia Sumaria Parcial" presentada por el Consejo y, en su consecuencia, le ordenó a Multinational a pagar, de forma inmediata, el ajuste de la reclamación, aun cuando Multinational ya había emitido el pago a base del valor depreciado ("actual cash value") de las partidas de daños reconocidas en su estimado, de conformidad con los términos y condiciones del contrato de seguros.

En atención a la presentación del recurso ante este foro revisor, el 30 de septiembre de 2021, el foro primario ordenó la paralización de los procedimientos hasta este foro revisor emitiera su Mandato.

Acaecidas varias incidencias procesales, las partes continuaron envueltas en un proceso de descubrimiento de prueba, que incluyó, entre otros asuntos, las inspecciones, preparación y notificación de los informes periciales de las partes.

Luego de varios trámites procesales impertinentes al recurso de epígrafe, el 6 de diciembre de 2022, el Consejo presentó *Moción Solicitando Designación de Comisionado(a) Especial*, a la cual se opuso la parte apelante mediante *Oposición a Solicitud de Designación de Comisionado Especial.*

El 21 de febrero de 2023, el foro primario le ordenó a las partes someter una moción conjunta donde propusieran un candidato para la designación de un Comisionado Especial al amparo de la Regla 41 de Procedimiento Civil. En cumplimiento con lo ordenado, las partes de epígrafe presentaron *Moción Conjunta en Cumplimiento de Orden Informando Acuerdo de Designación de Comisionado Especial.* Consecuentemente, el foro *a quo* emitió *Orden de Nombramiento y Encomienda de Comisionado Especial* donde le encomendó al comisionado elegido por las partes: 1) resolver todas las controversias planteadas en el caso de epígrafe respecto a los daños reclamados, 2) completar inventario y avalúo de daños ocasionados por el huracán María en la propiedad, 3) establecer el alcance de aquellas reparaciones necesarias, 4) conforme a la prueba presentada por las partes, ajustar el valor de daños conforme a los términos, límites asegurados, condiciones y exclusiones de la póliza expedida por Multinational, y 5) reconocer créditos a las partes según correspondiera.

Tras varias incidencias de rigor, el 12 de febrero de 2025, las partes presentaron *Moción Conjunta Presentando Informe del Comisionado Especial,* a la cual anejaron el *Informe Preliminar* y el *Informe Final.* Mediante moción al efecto, la parte apelada le solicitó al foro primario que adoptara el Informe Final del Comisionado Especial y concediera remedios adicionales. Por su parte, Multinational ripostó al petitorio del Consejo y solicitó que se ordenara el desglose de la aludida moción, debido a la notificación defectuosa de Informe en cuestión por parte de la Secretaría del

tribunal. Finalmente, el referido Informe fue debidamente notificado mediante *Orden*, el 3 de mayo de 2025.

El 2 de junio de 2025, la parte apelante presentó *Moción Notificando Objeciones al Informe del Comisionado Especial*. A la precitada moción se opuso la parte apelada el 23 de junio de 2025.

Así las cosas, el 5 de noviembre de 2025, el foro recurrido celebró una vista argumentativa en la que las partes expusieron sus planteamientos respecto al *Informe Final* emitido por el Comisionado Especial. Luego de sometido y discutido por las partes el *Informe Final* en controversia, la Juzgadora de primera instancia le ordenó al Comisionado que actualizara los costos reconocidos al 2025.

Posteriormente, el Tribunal de Primera Instancia emitió *Sentencia* apelada. Dispuso que, luego de evaluar el *Informe Final*, así como los escritos de las partes y sus argumentos presentados en la vista, acogía dicho informe en su totalidad. A tales efectos, adoptó las determinaciones de hechos esbozadas en el *Informe Final*. El foro *a quo*, determinó que, el Comisionado Especial desempeñó de manera efectiva y puntual las responsabilidades delegadas. Asimismo, concluyó que, la cantidad total concedida a la parte apelada por concepto de los daños producto del huracán María, luego de considerar los daños, deducibles y los términos y condiciones de la Póliza, era de $1,851,336.55. A juicio del foro de primera instancia Multinational reiteradamente se negó a ofrecer pagar cuantías de acuerdo a los daños sufridos en la propiedad, dentro de un tiempo razonable. El foro primario razonó que, las acciones de Multinational habían causado que el Consejo tuviera que incurrir en gastos de reparación en un periodo en el cual los precios de mano de obra y materiales de construcción eran mayores a los que existían al momento del evento que causó la pérdida. A tales efectos, el foro primario le ordenó a la parte apelante el pago de intereses por mora, para un total de $945,576.48, lo cual

aumenta la cuantía total en daños a $2,796,913.03. Asimismo, concedió a la parte apelada una partida por honorarios de abogado, ascendente a $922,981.30, equivalentes al 33% de los $2,796,913.03.

En su *Sentencia* la primera instancia judicial emitió las siguientes determinaciones de hechos:

1.    Multinational Insurance Company es una compañía de seguros, organizada, autorizada y existente conforme a las leyes del Estado Libre Asociado de Puerto Rico.

2.    Multinational Insurance Company emitió una Póliza a favor del Consejo de Titulares para asegurar al Condominio Villas del Mar Beach Resort.

3.    La Póliza ofrecía cubierta para la propiedad Condominio Villas del Mar Beach Resort ubicada en la Carr. # 187 Km. 7 Bo. Mediana Alta, Loíza, Puerto Rico 00772.

4.    El Condominio Villas del Mar Beach Resort consiste en 10 edificios de 3 y/o 4 pisos cada uno, tipo "walk-up" con un total de 227 unidades de apartamentos residenciales.

5.    El periodo de vigencia de la Póliza era de 28 de febrero del 2017 al 28 de febrero del 2018.

6.    Según las declaraciones de la Póliza, la cubierta, la cual tenía un límite agregado de $24,817,555.00 dividido de la siguiente manera:

| Localización | Límites | Deducible |
|---|---|---|
| Building 1 A | $2,487,392 | $49,747.84 |
| Building 2 B | $2,487.392 | $49,747.84 |
| Building 3 C | $1,494,292 | $29,885.84 |
| Building 4 D | $1,975,645 | $39,512.92 |
| Building 5 E | $1,647,888 | $32,957.76 |
| Building 6 F | $2,940,356 | $58,807.12 |
| Building 7 G | $2,940,356 | $58,807.12 |
| Building 8 H | $2,487.392 | $49,747.84 |
| Building 9 I | $2,940,356 | $58,807.12 |
| Building 10 J | $1,494,292 | $29,885.84 |
| **TOTALS** | **$22,895,361.00** | **$457,907.22** |

| Localización | Límites | Deducible |
|---|---|---|
| Bld Light poles, Street signs flagpoles, fire alarm | $114.977.00 | $2,299.54 |
| Bld 1 Fences & Arbors | $187,000.00 | $3,740.00 |
| Bld 1 Electric Transformers | $168,525.00 | $3,370.50 |
| Bld 11 Club House Pools | $83,210.00 | $1,664.20 |
| Bld 12 Club House Pool Fence | $6,562.00 | $131.24 |
| Bld 13 Club House Bld | $189,360.00 | $3,787.20 |
| Bld 14 Beach Area Pool | $64,385.00 | $1,287.70 |
| Bld 15 Beach area Pool Fence | $5,900.00 | $118.00 |

| | | |
|---|---|---|
| Bl[d] 16 Beach area pool pumps Structure | $5,741.00 | $114.82 |
| Bld 17 Beach area bathrooms | $6,138.00 | $122.76 |
| Bld 18 Beach area pool gazebo | $12,102.00 | $242.04 |
| Bld 19 Vehicular Gates | $19,690.00 | $393.80 |
| Bld 20 Electrical generator | $29,000.00 | $580.00 |
| Bld 21 Generator House | $12,977.00 | $259.54 |
| Bld 22 Potable water pump/ cistern | $143,170.00 | $2,863.40 |
| Bld 23 Mailbox Station | $26,471.00 | $529.42 |
| Bld 24 Guard house & entrance Arc | $43,399.00 | $867.98 |
| Bld 25 Waste Bin Containers | $13,399.00 | $267.98 |
| Bld 26 Beach & Tennis Gazebo | $36,901.00 | $738.02 |
| Bld 27 Waste Bin containers structure | $11,900.00 | $238.00 |
| Bld 28 Retaining walls | $46,447.00 | $928.94 |
| Bld 29 Playground | $33,600.00 | $672.00 |
| Bld 30 Surveillance system | $3,900.00 | $78.00 |
| Bld 31 Intercom system & tele entry | $16,00.00 | $320.00 |
| Bld 32 Paved areas | $416,000.00 | $8,320.00 |
| Bld 33 High pole and Transformer | $15,200.00 | $304.00 |
| Bld 34 Exterior Benches and tables | $1,900.00 | $38.00 |
| Bld 35 Wheel stoppers | $23,790.00 | $475.80 |
| Bld 36 Bracket Lamps | $7,900.00 | $158.00 |
| Bld 37 Tennis Courts | $$44,000.00 | $880.00 |
| Bld 38 Tennis courts fences | $12,600.00 | $252.00 |
| Bld 39 Tennis courts illumination | $10,900.00 | $218.00 |
| Bld 40 Gym Building | $83,550.00 | $1,671.00 |
| Bld 41 Basketball 1/2 court | $14,300.00 | $286.00 |
| Bld 42 Basketball court illumination | $5,600.00 | $112.00 |
| Bld 43 Air conditioning units | $5,700.00 | $114.00 |
| | $1,992.194.00 | $38,443.88 |

7. La Póliza tiene un deducible de dos por ciento (2%) para "tormentas de viento" (conocida como *windstorm*).

8. La Póliza es una póliza de tipo "a todo riesgo" (conocida como *all-risk*), por lo que cubre todo tipo de daño a la propiedad asegurada, a menos que el tipo de daño esté expresamente excluido.

9. La Póliza expedida a favor del Consejo de Titulares se compone de varias secciones. La hoja de declaraciones sirve como un resumen del resto de la Póliza. A lo anterior, le sigue el índice de los formularios, y luego los formularios y endosos que contienen los términos de la Póliza.

10. La hoja de declaraciones de la Póliza contiene una descripción de la propiedad asegurada con su ubicación, el periodo de vigencia, número de póliza y la prima, y límites y deducibles para cada cubierta, entre otros detalles generales.

11. A grandes rasgos, la cubierta de propiedad comercial cubre daños a las estructuras y equipos

que componen la propiedad asegurada, causados por alguno de los eventos cubiertos por la Póliza.

12. Las causas de pérdida cubiertas son aquellas causas que provocan que se active la obligación de indemnizar y están descritas en la Póliza.

13. La Póliza requiere reparar, reconstruir, reemplazar la propiedad dañada *"with other property of the like kind and quality"*.

14. El huracán María impactó a Puerto Rico el 20 de septiembre de 2017.

15. El huracán María causó daños en el Condominio Villas del Mar Beach Resort.

16. Oportunamente, en octubre de 2017, el Consejo de Titulares presentó una reclamación ante Multinational Insurance Company por los daños que sufrió el Condominio Villas del Mar Beach Resort a raíz del huracán María.[4]

17. El número de la reclamación del Consejo de Titulares, asignado por Multinational, es el núm. 317405.

18. El 2 de julio de 2019, Multinational Insurance Company notificó al Consejo de Titulares un ajuste revisado de la reclamación reconociendo que le debe al Consejo de Titulares la suma de $192,654.28 por concepto de la reclamación luego de aplicado el deducible correspondiente, sujeto a la deducción de adelantos previos.

19. Los daños causados por el huracán María en el Condominio Villas del Mar Resort, según estimados en el Informe Final del Comisionado Especial, ascienden a $2,449,309.78, lo que, luego de aplicado el deducible y demás términos y condiciones de la Póliza, resulta en una cantidad neta, pagadera al Consejo de Titulares, de $1,966,763.34.

20. Según las determinaciones del Comisionado Especial en su Informe Final, la siguiente tabla detalla estas cantidades y la aplicación de Póliza en cuanto a los deducibles por localización:

| Localización (Building) | Límites | Comisionado | Deducible | Cantidad Neta |
|---|---|---|---|---|
| 1-A | $2,487,392 | $248,020.12 | $49,747.84 | $198,272.28 |
| 2-B | $2,487,392 | $203,084.94 | $49,747.84 | $153,337.10 |
| 3-C | $1,494,292 | $158,484.60 | $29,885,84 | $128,598.76 |
| 4-D | $1,975,645 | $168,410.54 | $39,512.90 | $128,897.64 |
| 5-E | $1,647,888 | $119,169.91 | $32,957.76 | $86,212.15 |
| 6-F | $2,940,356 | $300,115.94 | $58,807.12 | $241,308.82 |
| 7-G | $2,940,356 | $271,345.67 | $58,807.12 | $212,538.55 |
| 8-H | $2,487,392 | $242,701.78 | $49,747.84 | $192,953.94 |

---

[4] Luego de examinar la *Demanda y Contestación a la Demanda* este Tribunal determina que el Consejo presentó su reclamación a Multinational como consecuencia de los daños sufridos por el huracán María en octubre de 2017. SUMAC 1, párr. 11; SUMAC 29, párr. 10. (*Nota al calce incluida en la Sentencia apelada.*)

| | | | | |
|---|---|---|---|---|
| 9-I | $2,940,356 | $263,678.70 | $58,807.12 | $204,871.58 |
| 10-J | $1,494,292 | $130,327.16 | $29,885.84 | $100,441.32 |
| Equipo, maquinaria y otros | | $151,249.24 | | $151,249.24 |
| **TOTALES** | **$22,895,361.00** | **$2,247,153.58** | **$457,907.22** | **$1,789,246.36** |
| | | | | |
| *Special classes* (Neto) | | $120,602.88 | | $95,963.66 |
| Cobertura Miscelánea | | $24,245.18 | | $24,245.18 |
| *Plus Building Incurred* | | $57,308.14 | | $57,308.14 |
| | | | | |
| **GRAN TOTAL** | | **$2,449,309.78** | | **$1,966,763.34** |

Inconforme, la parte apelante presentó el recurso cuya revisión nos atiene y esgrimió los siguientes señalamientos de error:

**A. Primer señalamiento de error:**
Incidió el TPI al incluir en su *Sentencia* honorarios de abogados[.]

**B. Segundo señalamiento de error**
Incidió el TPI al incluir en su *Sentencia* intereses por mora.

**C. Tercer señalamiento de error:**
Incidió el TPI al incluir en su *Sentencia* un aumento por inflación

**D. Cuarto señalamiento de error**
Incidió el TPI al incluir en su *Sentencia* intereses por mora simultáneamente con un aumento por inflación.

**E. Quinto señalamiento de error:**
Incidió el TPI al determinar que MIC tenía una obligación de pago.

**F. Sexto señalamiento de error**
Incidió el TPI al determinar que MIC tenía que resolver la reclamación para el 1 de febrero de 2018.

**G. Séptimo señalamiento de error:**
Incidió el TPI al concluir que el trato de MIC fue injusto, carente de razonabilidad, que MIC forzó al Consejo a presentar la demanda que MIC no cumplió con sus obligaciones al amparo de la póliza y el Código de Seguros, y que entabló una defensa hostil.

**H. Octavo señalamiento de error**
Incidió el TPI al no considerar las objeciones específicas de MIC al informe del Comisionado Especial

El 10 de marzo de 2026, compareció el Consejo de Titulares mediante *Alegato en Oposición a Apelación.*

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

**II**

### *El Contrato de Seguro*

Nuestro Tribunal Supremo de Puerto Rico ha reconocido el alto interés público con el que está investido el negocio de seguros en Puerto Rico, "debido al papel que juega en la protección de los riesgos que amenazan la vida o el patrimonio de los ciudadanos" y "la extraordinaria importancia que juegan los seguros en la estabilidad de nuestra sociedad". *R.J. Reynolds v. Vega Otero,* 197 DPR 699, 706 (2017) (citando a *Natal Cruz v. Santiago Negrón et al.,* 188 DPR 564, 575 (2013)).

Generalmente se define el seguro como un contrato por el que una de las partes (conocida como asegurador), a cambio de una contraprestación que suele pagarse en dinero, ya sea en una suma global o en diferentes momentos durante la duración del riesgo, se compromete a realizar un determinado pago, normalmente en dinero, en caso de destrucción o daño de algún bien en el que la otra parte (conocida como asegurado) tiene un interés. 1 Couch on Insurance 3d Sec. 1:6 (2021). Por su parte, el Código de Seguros de Puerto Rico define un contrato de seguro como un "contrato mediante el cual una persona se obliga a indemnizar a otra o a proveerle un beneficio específico o determinable al producirse un suceso incierto, previsto en el mismo". Art. 1 del Código de Seguros de Puerto Rico, 26 LPRA sec. 102. *San Luis Center Apts. et al. v. Triple S,* 208 DPR 824, 830-831 (2022).

Debido a la gama de actividades económicas en las cuales una persona se expone a lo largo de su vida, se han creado distintos tipos de seguros para atenuar los riesgos inherentes a cada actividad. Es así por lo que contamos con seguros de vida, salud, empleo y propiedad, entre otros. En particular, en la controversia ante

nuestra consideración, las partes suscribieron un contrato de seguro de propiedad.

En Puerto Rico, el negocio de los seguros está investido de un gran interés público debido a la importancia, la complejidad y el efecto en la economía y estabilidad de la sociedad que representa. *Rivera Matos, et als.* v. *ELA, et al.*, 204 DPR 1010, 1019 (2020).[5] La industria de los seguros está extensamente reglamentada mediante la Ley Núm. 77 de 19 de junio de 1957, según enmendada, conocida como el Código de Seguros de Puerto Rico, 26 LPRA sec. 101 *et seq.* Allí se define *seguro* como el contrato mediante el cual una persona se obliga a indemnizar a otra o a pagarle o proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo. 26 LPRA sec. 102. *Carrasquillo Pérez v.et al. v. CMS*, 214 DPR 1033, 1049-1050 (2024).

En el ámbito comercial, "el negocio de seguros se convierte en uno de los principales soportes que permite amortiguar los giros violentos de incertidumbre propios del mercado, aminora sus efectos y permite un crecimiento más estable de la economía". *Rivera Matos et al. v. Triple-S et al.*, supra, pág. 1019; *R.J. Reynolds v. Vega Otero*, supra, pág. 707. Igual trascendencia tiene en el ámbito individual, al proteger o amortiguar los riesgos que experimenta el ciudadano promedio, producto de las inclemencias del tiempo, accidentes y enfermedades, entre otros.[6]

Los términos que se encuentran en el contrato de seguros están contenidos en la póliza por escrito. Art. 11.140(1) del Código de Seguros, 26 LPRA sec. 1114(1). Nuestra última instancia judicial ha expresado que cuando nos corresponda interpretar las cláusulas de un contrato de seguro "el propio Código de Seguros pauta la norma que ha de regir nuestra función hermenéutica". *R.J. Reynolds*

---

[5] Véase, además, *R.J. Reynolds v. Vega Otero*, supra, pág. 706.
[6] *San Luis Center Apts., et al v. Triple-S*, supra, pág. 832.

*v. Vega Otero*, supra, pág. 707. "A esos efectos, dispone que los contratos de seguro se interpretan globalmente, a base del conjunto total de sus términos y condiciones, según expuestos en la póliza". Íd. Véase Art. 11.250 del Código de Seguros, 26 LPRA sec. 1125. Los términos de los contratos de seguro se rigen por las normas de interpretación aplicables a los contratos en general. Couch, supra, Vol. 2, Sec. 22:1 esc. 1 ("Insurance policies are controlled by the rules of construction that are applicable to contracts generally").[7]

Sobre este particular, el Código de Seguros de Puerto Rico dispone que el contrato de seguro deberá interpretarse [...] a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta". Art. 11.250 del Código de Seguros, 26 LPRA sec. 1125. *Carrasquillo Pérez v.et al. v. CMS*, supra, pág.1050.

Ahora bien, si los términos de la póliza son claros, específicos y ausentes de ambigüedad, su cumplimiento será obligatorio, pues el contenido del contrato constituye la **ley entre las partes**.[8] Los términos de una póliza se reputarán claros cuando su lenguaje sea específico, cuando no dé lugar a dudas o cuando no sea susceptible a distintas interpretaciones.[9] A su vez, "los términos de las pólizas de seguro deben ser generalmente entendidos en su más corriente y usual significado, sin atender demasiado al rigor gramatical, sino al uso general y popular de las voces". *Carrasquillo Pérez v.et al. v. CMS*, supra, pág.1050.

Nuestra Máxima Curia ha señalado que, [s]i bien es cierto que el propósito de todo contrato de seguros es la indemnización y protección en caso de producirse el suceso incierto previsto en el

---

[7] *Id.*
[8] *Id.*; *Echandi Otero v. Stewart Title*, 174 DPR 355, 369 (2008).
[9] *San Luis Center Apts. et al. v. Triple S*, supra, pág. 833.

mismo, **"[a]l determinar cuáles son los riesgos cubiertos por una póliza de seguro es necesario considerar si en el contrato figura una cláusula de exclusión"**. (Negrilla suplida en el original).[10]

Como es sabido, las cláusulas de exclusión contenidas en las pólizas de seguro tienen el propósito de "limitar la cubierta establecida en el acuerdo principal y disponen que el asegurador no responderá por determinados eventos, riesgos o peligros." *Monteagudo Pérez v. ELA,*172 DPR 12 (2007). La función de este tipo de cláusula es "eliminar la responsabilidad que tiene el asegurador de indemnizar por las pérdidas resultantes de los riesgos excluidos." *Echandi Otero v. Stewart Title*, 174 DPR 355 (2008).

Si bien es cierto que, como regla general, las exclusiones son desfavorecidas, por lo que deben de interpretarse restrictivamente en contra del asegurador y de este modo resguardar la esencia propia del seguro, "si los términos de las cláusulas de exclusión son claros y aplican a una situación determinada, no podrá responsabilizarse a la aseguradora por aquellos riesgos expresamente exceptuados". *Rivera Matos, et als. v. ELA, et al.*, supra, pág. 1021.

Los términos del contrato de seguro se consideran claros cuando su lenguaje es específico, sin que dé lugar a dudas o ambigüedades, o sin que sea susceptible a diferentes interpretaciones. *Id.* Sin embargo, debido a que el contrato de seguro es un contrato de adhesión, las cláusulas dudosas o ambiguas deberán interpretarse liberalmente en beneficio del asegurado. *Id.*

Se denomina póliza el documento donde se consignan los términos que rigen el contrato de seguro. Art. 11.140(1) del Código de Seguros, 26 LPRA sec. 1114(1). Conforme dispone el propio Código de Seguros, en primera instancia las cláusulas de una póliza

---

[10] *Id.*, págs. 1050-1051.

se interpretarán de manera global, examinando el conjunto total de las disposiciones, términos y condiciones vigentes a la fecha que se juzgue relevante. Art. 11.250 del Código de Seguros, 26 LPRA sec. 1125. *Rivera Matos, et als.* v. *ELA, et al.*, supra, pág. 1020, citando con aprobación a *R.J. Reynolds v. Vega Otero, supra*; y *Viruet et al. v. SLG Casiano-Reyes*, 194 DPR 271 (2015).

En consecuencia, corresponde interpretar el lenguaje plasmado en la póliza en su acepción de uso común general, sin ceñirse demasiado al rigor gramatical. *Jiménez López et al. v. Simed,* 180 DPR 1 (2010); *S.L.G. Francis-Acevedo v. SIMED*, 176 DPR 372 (2009); *Echandi Otero v. Stewart Title*, 174 DPR 355 (2008). De igual forma se examinarán las cláusulas desde la óptica de una persona normal de inteligencia promedio que fuese a adquirir el seguro. *S.L.G. Ortiz-Alvarado v. Great American,* 182 DPR 48 (2011). De este modo, se garantiza que el asegurado que adquiere una póliza reconoce el alcance de la protección del producto que ha comprado. *Rivera Matos, et als.* v. *ELA, et al.*, supra.

Por último, la Alta Curia ha aclarado que: "Primeramente, corresponde al asegurado el peso de establecer que su reclamación está comprendida dentro de las disposiciones del contrato de seguro, mientras que es la aseguradora quien tiene que evidenciar que aplica alguna exclusión. Véase A.D. Windt, <u>Insurance Claims and Disputes</u>, 6ta ed., St. Paul, Minn., Ed. Thompson Reuters, 2013, Sec. 9.1, págs. 9-2 y 9.6 (2013). Véanse, además, *Echandi Otero v. Stewart Title*, supra; *Martínez Pérez v. U.C.B.,* 143 DPR 554 (1997)." *Rivera Matos, et als. v. ELA, et al.*, supra.

### *Término para la resolución de reclamaciones*

El Código de Seguros de Puerto Rico, en su Art. 27.162, 26 LPRA sec. 2716b, dispone lo relativo al término con el que cuentan las aseguradoras para resolver las reclamaciones que le son

presentadas bajo las pólizas emitidas por estas.  En lo pertinente, el aludido cuerpo legal dispone lo siguiente:

**§ 2716b.  Término para la resolución de reclamaciones**

(1)  La investigación, ajuste y resolución de cualquier reclamación se hará en el período razonablemente más corto dentro de noventa (90) días después de haberse sometido al asegurador la reclamación.

(2)  En el caso de que un asegurador no pueda resolver una reclamación en el término establecido en el inciso (1) de esta sección, deberá mantener en sus expedientes los documentos que acrediten la existencia de justa causa para exceder el término anteriormente dispuesto.

(3)  El Comisionado en cualquier momento podrá ordenar la resolución inmediata de cualquier reclamación si considera que se está dilatando o retrasando indebida e injustificadamente la resolución de la misma.

En consonancia con el anterior articulado, el Art. 27.163 del referido Código, 26 LPRA sec. 2716c, dispone lo atinente a los métodos para resolver las reclamaciones.  Sobre el particular, establece lo siguiente:

**§ 2716c. Métodos para resolver una reclamación**

Los siguientes actos constituyen resolver una reclamación:

(1)  El pago total de la reclamación.

(2)  La denegación escrita y debidamente fundamentada de la reclamación.

(3)  El cierre de la reclamación por inactividad del reclamante, cuando el reclamante no coopere o no entregue la información necesaria para que el asegurador pueda ajustar la reclamación. Disponiéndose, que el asegurador notificará inmediatamente al reclamante del cierre de la misma, salvo que en tales circunstancias el cierre será sin perjuicio de permitir nuevamente la presentación de dicha reclamación.

***Regla 41 de Procedimiento Civil***

Como es sabido, la Regla 41 de Procedimiento Civil, 32 LPRA Ap. V, dispone lo concerniente al nombramiento de comisionados especiales.  Los foros judiciales están facultados para nombrar un comisionado especial con relación a un pleito pendiente que se

encuentre ante su consideración[11].  Nuestro ordenamiento jurídico ha dispuesto que, el nombramiento de un comisionado especial en los foros de instancia será la excepción y no la regla[12].  *Cestero v. Pérez de Jesús*, 104 DPR 891, 893 (1976).  De igual forma, la Regla 41.2 de Procedimiento Civil, *supra*, dispone que, no se encomendará un pleito a un comisionado, a menos que "[e]stén involucradas cuestiones sobre cuentas y cómputos difíciles de daños o casos que involucren cuestiones sumamente técnicas o de un conocimiento pericial altamente especializado"[13].  La precitada regla, además, dispone que, no procederá nombrar un comisionado especial si una parte logra demostrar que dicho nombramiento ocasionaría una dilación innecesaria en los procedimientos o unos costos irrazonables[14].

Esta regla tiene el propósito de "[p]reservar la integridad del sistema al que la Constitución extendió el ejercicio del Poder Judicial y que diseñ[ó] como unificado en lo concerniente a jurisdicción, funcionamiento y administración".  *Cestero v. Pérez de Jesús*, supra, pág. 893.  Es por lo que, la designación de un comisionado deberá justificarse como solución única a una situación extrema.  *Íd.*  Además, previo a seleccionar un comisionado especial, será necesario que, el juzgador de hechos evalúe concienzudamente los siguientes factores: la especialidad técnica del litigio, los intereses de las partes, el tiempo que reclaman para su controversia y el estado del calendario de su sala.  *Íd.* pág. 894.

Queda claro que, a pesar de que los tribunales se encuentran facultados para elegir un comisionado especial, conforme a la Regla 41 de Procedimiento Civil, esto debe darse solo en circunstancias

---

[11] Regla 41.1 de Procedimiento Civil, *supra*.
[12] Regla 42.1 de Procedimiento Civil, *supra*.
[13] 32 LPRA Ap. V. R. 41.2.
[14] 32 LPRA Ap. V. R. 41.2.

extremas y luego de realizar una extensa evaluación que justifique su nombramiento.

### *Honorarios de Abogado*

La concesión de honorarios de abogado está regulada por la Regla 44.1 (d) de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 44.1 (d). La misma autoriza al Tribunal a imponer honorarios de abogado cuando una parte o su abogado procede con temeridad o frivolidad. *Pérez Rodríguez v. López Rodríguez et al.*, 210 DPR 163, 192 (2022).

De esta manera, la imposición o concesión de honorarios de abogado no procede en todos los casos. Depende, pues, de la determinación discrecional que haga el tribunal en torno a si la parte perdidosa o su abogado, actuaron con temeridad o frivolidad, o de la existencia de una ley especial que ordene la imposición de los honorarios. *SLG González-Figueroa v. SLG et al.*, 209 DPR 138, 148-149 (2022); *Ortiz Valle v. Panadería Ricomini,* 210 DPR 831, 839-840 (2022) (caso bajo la Ley 100-1959, la cual ordena el pago de honorarios). Nuestro Alto Foro ha puntualizado que: "[s]in duda, para reclamar honorarios de abogado y los intereses presentencia *es imprescindible* que se haya actuado con temeridad durante el trámite judicial". *SLG González-Figueroa v. SLG et al.*, supra, pág. 148 (énfasis suplido).

La *temeridad* se define como aquella conducta que hace necesario un pleito que se pudo evitar, que lo prolonga innecesariamente o que obliga que la otra parte incurra en gestiones evitables. *Íd.*; *Marrero Rosado v. Marrero Rosado,* 178 DPR 476, 504 (2010). Sobre este particular, nuestro más Alto Foro ha expresado también que "[l]a temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia". *Jarra Corp. v. Axxis Corp.,* 155 DPR

764, 779 (2001) citando a *Elba A.B.M. v. U.P.R.*, 125 PR 294, 329 (1990).

En *Feliciano Polanco v. Feliciano González,* 147 DPR 722, 730 (1999), el Tribunal Supremo de Puerto Rico estableció unos ejemplos de conducta temeraria, la cual incluye:

> [C]uando el demandado contesta la demanda y niega su responsabilidad total, aunque la acepte posteriormente; cuando se defiende injustificadamente de la acción que se presenta en su contra; cuando no admite francamente su responsabilidad limitada o parcial, a pesar de creer que la única razón que tiene para oponerse a la demanda es que la cuantía es exagerada; cuando se arriesga a litigar un caso del que prima facie se desprende su negligencia; o cuando niega un hecho que le consta ser cierto.

El propósito de la imposición de honorarios de abogado en casos de temeridad es "establecer una penalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito". *Andamios de PR v. Newport Bonding*, 179 DPR 503, 520 (2010); *Pérez Rodríguez v. López Rodríguez et al.*, supra, pág. 193; *SLG González-Figueroa v. SLG et al.*, supra, págs. 148-149.

Además, la imposición de honorarios de abogado tiene como objetivo disuadir la litigación innecesaria y alentar las transacciones mediante la imposición de sanciones a la parte temeraria para compensar los perjuicios económicos y las molestias sufridas por la otra parte. *Íd.* págs. 718-719. Nuestro más Alto Foro ha dispuesto que, la facultad de imponer honorarios de abogados es "la mejor arma que ostentan los tribunales para gestionar de forma eficaz los procedimientos judiciales y el tiempo de la administración de la justicia, así como para proteger a los litigantes de la dilación y los gastos innecesarios". *SLG González-Figueroa v. SLG et al.*, supra, pág. 149.

La determinación sobre si una parte ha procedido con temeridad descansa en la sana discreción del tribunal sentenciador y no será variada en apelación a menos que se demuestre que este ha abusado de su discreción. *Pérez Rodríguez v. López Rodríguez et al.*, supra, pág. 193; *SLG González-Figueroa v. SLG et al.*, supra, pág. 150. Tampoco será variada la partida concedida a menos que resulte ser excesiva, exigua o constituya un abuso de discreción. *Feliciano Polanco v. Feliciano González*, supra, en las págs. 729.

Ahora bien, una vez el tribunal determina que se incurrió en temeridad, está obligado a imponer el pago de los honorarios de abogado a favor de la parte que prevaleció en el pleito. *PR Fast Ferries et al. v. AAPP*, 213 DPR 103, 115 (2023).

### *Intereses por mora en reclamaciones de seguro*

En nuestro ordenamiento civil se reconocen como fuentes de las obligaciones la ley, los contratos y cuasicontratos, y los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia. Art. 1042 de Código Civil de 1930, 31 LPRA ant. sec. 1042. Además, una persona está sujeta a indemnizar los daños y perjuicios causados cuando en el cumplimiento de una obligación incurre en dolo, negligencia o **morosidad**. Art. 1054, Código Civil de 1930, 31 LPRA ant. sec. 3018.

Nuestro Tribunal Supremo ha expresado que, el deudor incurre en mora cuando el acreedor exige, judicial o extrajudicialmente, el cumplimiento de la obligación. Art. 1053 del Código Civil de 1930, 31 LPRA ant. sec. 3017. Sobre la mora en el cumplimento de una obligación los comentaristas señalan que deben concurrir los requisitos siguientes: (1) una obligación de dar o hacer; (2) que el acreedor requiera el cumplimiento al deudor judicial o extrajudicialmente; (3) que la obligación sea exigible y líquida, y esté vencida; (4) que el retraso sea imputable al deudor, y (5) que el retraso en cumplir se haya producido por la culpa del

deudor. *Véase,* L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil,* 11ma ed., Madrid, Ed. Tecnos, 2023, Volumen II, Tomo 1, págs. 191-192. J. Castán Tobeñas, *Derecho Civil Español, Común y Foral,* 17ma ed., Madrid, Ed. Reus S.A., 2008, Tomo III, págs. 238-240. *Consejo de Tit. Cond. Playa Azul II, v. MAPFRE PRAICO Insurance Co.,* 2024 TSPR 140; 215 DPR ___ (2024).

El Art. 1061 del Código Civil de 1930, 31 LPRA ant. sec. 3025, aborda que la indemnización en caso de mora consiste en el pago de intereses. Este artículo dispone en lo pertinente que:

> Si la obligación consistiere en el pago de una cantidad de dinero y el deudor incurriere en mora, la indemnización de daños y perjuicios, no habiendo pacto en contrario, consistirá en el pago de los intereses convenidos, y a falta de convenio, en el interés legal.

De igual forma, en *Rivera v. Crescioni,* 77 DPR 47, 56 (1954), nuestra Máxima Curia expresó que los intereses por mora "son una indemnización independiente de daños y perjuicios, impuesta como penalidad por la demora en el pago". Por consiguiente, estos "[n]o constituyen parte integrante e inherentemente inseparable de la obligación principal". *Íd.* La indemnización por intereses moratorios es un derecho personal del acreedor, que puede ser renunciado. *Íd.* Así las cosas, Castán Tobeñas señala:

> Los efectos de la mora desaparecen por lo que se llama purga de la misma (*purgatio morae).* Aunque el Código Civil no la regula, puede decirse que la mora cesa: 1) Por voluntad del acreedor, como en los casos de renuncia al pago de la indemnización debida, concesión de prórroga, novación de la obligación, etc. [. . .] 2) por concesión de un plazo legal al deudor (moratorias). 3) Por incurrir también el acreedor en mora (*compensatio morae).* J. Castán Tobeñas, *op. sic.,* pág. 244.

Cuando una parte incurre en mora, el Tribunal sentenciador puede conceder intereses aun cuando estos no hayan sido solicitados en la demanda. *Fuentes v. Hull Dobbs Co. of P.R.,* 88 DPR 562, 571(1963). **No obstante, el interés moratorio tiene que estar expresamente incluido en la Sentencia para ser recobrado.**

*Rivera v. Crescioni, supra. Consejo de Tit. Cond. Playa Azul II, v. MAPFRE PRAICO Insurance Co.*, supra.

### *Deferencia al Tribunal de Primera Instancia*

Según es sabido, las determinaciones de hechos y de credibilidad del tribunal sentenciador deben ser merecedoras de gran deferencia por parte de los foros apelativos, puesto que, el juzgador de instancia es quien –de ordinario– se encuentra en mejor posición para aquilatar la prueba testifical. *Pueblo v. Hernández Doble,* 210 DPR 850, 864 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021); *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 770-771 (2013); *Hernández Maldonado v. Taco Maker,* 181 DPR 281, 289 (2011); *SLG Rivera Carrasquillo v. AAA,* 177 DPR 345, 356 (2009). Bajo este supuesto, los foros de primera instancia tienen la oportunidad de oír, ver y apreciar el comportamiento de los testigos. *Pueblo v. Hernández Doble*, supra, pág. 864; *Santiago Ortiz v. Real Legacy et al.*, supra, pág. 219; *Meléndez Vega v. El Vocero de PR,* 189 DPR 123, 142 (2013).

No obstante, la deferencia judicial no es absoluta, pues podrá ser preterida en ciertas instancias. Nuestro Máximo Foro ha reiterado que, los tribunales apelativos no debemos intervenir con las determinaciones ni las adjudicaciones de los juzgadores de primera instancia, salvo que medie pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Hernández Doble*, supra, pág. 864; *Santiago Ortiz v. Real Legacy et al.*, supra, pág. 219; *Santiago Montañez v. Fresenius Medical*, 195 DPR 476, 490 (2016); *Dávila Nieves v. Meléndez Marín,* supra, pág. 753; *Rodríguez et al. v. Hospital et al.,* 186 DPR 889, 908-909 (2012); *SLG Rivera Carrasquillo v. AAA,* supra.

Como sabemos, "[l]a tarea de determinar cuándo un tribunal ha abusado de su discreción no es una fácil. Sin embargo, no tenemos duda de que el adecuado ejercicio de discreción judicial

está estrechamente relacionado con el concepto de razonabilidad." *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434-435 (2013). Véase, además, *Pueblo v. Rivera Montalvo*, 205 DPR 352, 373 (2020); *Umpierre Matos v. Juelle, Mejía*, 203 DPR 254, 275 (2019), citando a *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000). Es por lo que, nuestra más Alta Curia ha definido la *discreción* como "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera." *Rivera et al. v. Arcos Dorados et al.*, 212 DPR 194 (2023); *Pueblo v. Rivera Montalvo*, supra, citando a *Citibank et al. v. ACBI et al.*, 200 DPR 724, 735 (2018); *Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 723, 729 (2016); *SLG Zapata-Rivera v. J.F. Montalvo*, supra, pág. 435, citando a *IG Builders et al. v. BBVAPR*, 185 DPR 307, 338 (2012); *Pueblo v. Rivera Santiago*, 176 DPR 559, 580 (2009). Así, la discreción se "nutr[e] de un juicio racional apoyado en la razonabilidad y fundamentado en un sentido llano de justicia; no es función al antojo o voluntad de uno, sin tasa ni limitación alguna." *Citibank et al. v. ACBI et al.*, supra, citando a *SLG Zapata-Rivera v. J.F. Montalvo*, supra, pág. 435; *HIETel v. PRTC*, 182 DPR 451, 459 (2011); *Santa Aponte v. Srio. del Senado*, 105 DPR 750, 770 (1977). Ello "no significa poder para actuar en una forma u otra, haciendo abstracción del resto del Derecho." *SLG Zapata-Rivera v. J.F. Montalvo*, supra, pág. 435, citando a *Bco. Popular de P.R. v. Mun. de Aguadilla*, 144 DPR 651, 658 (1997); *HIETel v. PRTC*, supra, citando a *Bco. Popular de P.R. v. Mun. de Aguadilla*, supra.

Esbozado el derecho que enmarca la controversia de epígrafe, procedemos a aplicarlo.

### III

En esta ocasión, nos corresponde determinar si, como nos plantea la parte apelante, el Tribunal de Primera Instancia incidió al incluir en su *Sentencia*: 1) honorarios de abogados; 2) intereses por

mora; 3) un aumento por inflación; 4) intereses por mora simultáneamente con un aumento por inflación. Asimismo, 5) al determinar que Multinational tenía una obligación de pago, 6) al determinar que Multinational tenía que resolver la reclamación para el 1 de febrero de 2018; 7) al concluir que el trato de Multinational fue injusto, carente de razonabilidad, que Multinational forzó al Consejo a presentar la demanda, que Multinational no cumplió con sus obligaciones al amparo de la póliza y el Código de Seguros, y que entabló una defensa hostil y 8) al no considerar las objeciones específicas de Multinational al Informe del Comisionado Especial.

Para una mejor comprensión y adjudicación de las controversias traídas ante nuestra consideración, estimamos prudente discutir, en primera instancia y de manera conjunta, los señalamientos de error *tercero*, *quinto, sexto, séptimo* y *octavo*. Por lo tanto, nos corresponde prioritariamente, determinar si ante los hechos que conforman el presente caso, la parte apelante tenía una obligación de pago para con la parte apelada.

Luego de una serena, meticulosa y desapasionada revisión del expediente ante nos, resulta meritorio puntualizar que, coincidimos eminentemente, con el foro *a quo* en cuanto a las *determinaciones de hechos* plasmadas en la *Sentencia* apelada, según esbozadas previamente. Ahora bien, colegimos que, al interpretar la Póliza, el foro primario se apartó de forma impermisible de las cláusulas y condiciones dispuestas en la misma, que como sabemos, constituye la ley entre las partes. Nos explicamos.

Aunque en principio, el contrato de seguro entre las partes constituye una fuente de obligaciones, hay que considerar todos y cada uno de los elementos subyacentes y obligaciones recíprocas entre las partes contratantes.

Conforme surge del expediente ante nuestra consideración, ante la imposibilidad de las partes de alcanzar un acuerdo respecto

al ajuste de la pérdida en cuestión, a solicitud de las partes, el 2 de junio de 2023, el foro primario designó al señor Luis R. Esteves como Comisionado Especial (en adelante, el Comisionado) y le encomendó recibir toda la evidencia e información requerida para: (i) resolver todas las controversias que plantea el presente caso en torno a los daños reclamados, (ii) completar un inventario y avalúo de daños ocasionados por el Huracán María en la propiedad, (iii) establecer el alcance de las reparaciones necesarias, (iv) de conformidad con la prueba presentada por las partes, ajustar el valor de los daños conforme los términos, límites asegurados, condiciones y exclusiones de la póliza expedida por Multinational, y (v) reconocer créditos a las partes según corresponda. Para ello, recibiría toda la evidencia y la prueba testifical y documental ofrecida las partes, sin perjuicio de que cualquiera de estas decidiera no presentar evidencia ahí listada, y la que él solicite a su discreción. A tales efectos, el Comisionado Especial quedó facultado para solicitar, así como admitir, toda aquella información que estimara necesaria para cumplir con su encomienda.

Conforme el Comisionado consignó en su *Informe*, luego de revisar todos los documentos presentados por ambas partes del pleito y dialogar con sus respectivos abogados, estos estuvieron de acuerdo que el Comisionado evaluara la prueba, y enviara un informe preliminar, que serviría como guía a las partes, en un intento de llegar a conclusiones y acuerdos entre las partes. Asimismo, el Comisionado consignó que, para preparar el aludido informe, tomó en consideración el edificio en total, techos, ventanas e interiores. Afirmó haber evaluado tanto los informes de cada perito, así como las deposiciones tomadas a estos y los informes de expertos involucrados anteriormente en el caso, dándole el mayor peso a la prueba presentada por los peritos actuales de las partes. Concluyó que, el total de daños sufridos directamente por el paso

del huracán María totaliza la cantidad Gross de $2,492,133.72 y que luego de efectuada la deducción correspondiente a los deducibles del edificio y de los Special Classes, la cantidad neta del reclamo es por $2,034,226.50.[15]

Luego de presentada la *Moción Conjunta presentando el Informe del Comisionado Especial* el foro *a quo* ordenó la notificación del aludido informe, a los fines de que las partes presentaran sus objeciones al mismo, según lo dispuesto por la Regla 41.5 (C) de Procedimiento Civil.[16] Subsiguientemente, entre otros trámites procesales, el 5 de noviembre de 2025, el foro primario celebró una vista argumentativa, en la cual las partes se expresaron sobre la metodología utilizada por el Comisionado, la suficiencia y peso de la prueba utilizada por este, así como la corrección de los ajustes aplicados. Es primordial puntualizar que, luego de sometido y discutido por las partes el *Informe Final* en controversia, la Juzgadora de primera instancia le ordenó al Comisionado que actualizara los costos reconocidos al 2025.

Habida cuenta de que la Póliza establece con particularidad el método de valoración de la pérdida, al así actuar, la primera instancia judicial soslayó los términos y condiciones del contrato de seguro entre las partes, lo que constituye un error de fondo en este caso. Como esbozado previamente, en la determinación de hecho número 8, el foro primario consignó que:

> 8. La Póliza es una póliza de tipo "a todo riesgo" (conocida como *all-risk*), por lo que cubre todo tipo de daño a la propiedad asegurada, a menos que el tipo de daño esté expresamente excluido.

---

[15] Indicó que, las partidas individuales de todas las categorías de construcción fueron definidas en reporte [Villas del Mar Commissioners Report v.5], el cual entra en detalles sobre cada partida presentada por las partes y por qué fueron aceptadas o rechazadas en este caso. Añadió que, aunque se enseñan números de ambas partes en la tabla comparativa, los totales y las opiniones finales fueron englobadas en los [Estimados del Comisionado V.8] incluidos con el informe. Afirmó que, según provisto en las reglas discutidas por el Comisionado, no se aceptó daño donde no se demostró prueba, se verificaron los apartamentos desde todas las fotos interiores provistas y se manejó el estimado basado en la evidencia presentada por ambas partes.
[16] 32 LPRA AP. V.

De una cuidadosa revisión de la póliza se desprende que, ciertamente, una póliza *todo riesgo* como la que nos ocupa, cubre los daños ocasionados por todo riesgo, salvo aquel riesgo que fuere excluido, esto es:

> The second drafting method is for the coverage part of the policy to state that the policy covers all causes of loss to the subject matter insured **except those causes which are specifically excepted, or persons or interests excluded from the policy.**

Razonamos que, el foro primario incidió al ordenarle al Comisionado Especial actualizar el valor de la pérdida al 2025 y, más aún, al requerir que se le añadiera un costo de inflación, habida cuenta de que tal proceder no está comprendido dentro de los términos y condiciones del contrato de seguro habido entre las partes. Para fines de la valoración de la pérdida, la Póliza en controversia estipula el concepto de valor de reemplazo (*replacement cost*). Ahora bien, que para que proceda la aplicación de la cubierta opcional de costo de reemplazo, **la póliza requiere reparar, reconstruir, reemplazar** la propiedad dañada con propiedad de tipo y calidad similar ("*with other Property of the like kind and quality*").

En la jurisdicción federal se ha reconocido que en aquellos casos en que el asegurador no ponga en posición al asegurado de llevar a cabo las reparaciones, podría resultar inaplicable el requisito de reemplazo. No obstante, no surge del de los hechos del caso que el asegurado haya requerido el desembolso del valor real en efectivo. Por otro lado, la parte apelante no negó cubierta. Por el contrario, según se desprende de la determinación de hecho número 18 y citamos:

> 18. El 2 de julio de 2019, Multinational Insurance Company notificó al Consejo de Titulares un ajuste revisado de la reclamación reconociendo que le debe al Consejo de Titulares la suma de $192,654.28 por concepto de la reclamación luego de aplicado el deducible correspondiente, sujeto a la deducción de adelantos previos.

Las cláusulas y condiciones de la póliza en cuestión son claras. En particular, el inciso A (4) dispone lo relativo a la cubierta adicional y en el sub inciso (e), establece lo pertinente al incremento en el costo de construcción. En específico, dispone:

**e. Increased Cost of Construction**

**(1)** This additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

[.....]

(7)    With respect to this additional Coverage:

(a) We will not pay for the Increased Cost of Construction:

(i) Until the property is actually repaired or replaced, at the same or other premises; and

(ii) Unless the repair or replacement is made as soon as reasonable possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

(b) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the increased Cost of Construction, subject to the provisions of e.(6) of the Additional Coverage, is the increased cost of construction at the same premises.

Asimismo, la póliza establece con meridiana claridad, lo pertinente al pago y la valoración de la pérdida.[17]

**4. Loss Payment**

a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

(3) Take all or any part of the property at an agreed or appraisal value; or

(4) repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

---

[17] Véase, página 11 de 15 de la Póliza.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement or compliance with any ordinance or law regulating the construction, use or repair of any property.

[.....]

**8. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

a. At actual cash value of the time of loss or damage, except as provided in **b.** and c. below.

b. If the limit of Insurance for Building satisfies the Additional condition, Coinsurance, and the cost to repair or replace the damages building property is $2,500 or less, we will pay the cost of the building repairs and replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property. However, the following property will be valued at the actual cash value, even when attached to the building:

(1) Awnings or floor coverings;

(2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

c. Glass at the cost of replacement with safety-glazing material if required by law.

A su vez, la aludida Póliza dispone lo pertinente a las cubiertas opcionales. Respecto a la cubierta adicional pertinente al caso de marras sobre Costo de Reemplazo (*Replacement Cost*), la misma establece lo siguiente:

[.....]
**G. Optional Coverage**
[.....]

**3. Replacement Cost**

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.
[.....]

**d. We will not pay on a replacement cost basis for any loss or damage:**

(1) **Until the repair or replacement is made as soon as reasonable possible after the loss or damage.**
(*Énfasis suplido*).

[.....]

e. We will not pay more for loss or damage on replacement cost basis than the least of (1), (2), or (3), subject to f. below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace the lost or damaged property with other property:

(a) Of comparable material and quality and

(b) Used for the same purpose; or

(3) The amount actually spent that is necessary to repair or replace the lost or damaged property... Énfasis subrayado nuestro.

Como sabemos, a tenor con el derecho previamente esbozado, los términos y condiciones de la póliza deben ser interpretados tomando en consideración el contexto de la cubierta en su totalidad. Empero, al foro primario ordenarle al Comisionado actualizar los costos de reparación al 2025 sin que se desprenda del expediente de marras que la parte apelada haya efectuado las reparaciones correspondientes o en la alternativa, las circunstancias particulares que pudieran dar lugar a que dicha parte pudiera ser eximido de tal requisito contractual, ciertamente, constituye una inobservancia del foro primario de los términos y condiciones de la póliza.

En su *sexto señalamiento*, la parte apelante arguye que, el foro primario erró al determinar que Multinational tenía que resolver la reclamación para el 1 de febrero de 2018. Por igual, en su *séptimo*

*señalamiento*, que, incidió el TPI al concluir que el trato de Multinational fue injusto, carente de razonabilidad, que Multinational forzó al Consejo a presentar la demanda que Multinational no cumplió con sus obligaciones al amparo de la póliza y el Código de Seguros, y que entabló una defensa hostil. Por estar intrínsecamente relacionados ambos señalamientos de error, los discutiremos de manera conjunta. Veamos.

La *Sentencia* apelada concluye en su determinación de hecho número 16 que:

> 16. Oportunamente, en octubre de 2017, el Consejo de Titulares presentó una reclamación ante Multinational Insurance Company por los daños que sufrió el Condominio Villas del Mar Beach Resort a raíz del huracán María.

Empero, según se desprende de la nota al calce número 2, incluida en la aludida *Sentencia*, dicha determinación de hecho fue realizada por foro primario a base de las alegaciones contenidas en la *Demanda* y en la *Contestación a la Demanda*. Lo anterior, sin que se desprenda del expediente que, en efecto, medió aludida reclamación y peor aún, sin una descripción y referencia específica a la misma. Consecuentemente, no es posible verificar la existencia, contenido y el alcance de la susodicha reclamación. Este foro revisor no puede dar por buena una determinación de hecho basada en meras conjeturas sin evidencia que la sostenga y mucho menos, con el propósito de imponerle responsabilidad a una parte.

Dicho lo anterior, procede repasar lo dispuesto por el Código de Seguros de Puerto Rico, así como las cartas Circulares del Comisionado de Seguro sobre el término que disponen las aseguradoras para resolver las reclamaciones que le son sometidas. A tenor con lo dispuesto por el Artículo 27.162 del Código de Seguros de Puerto Rico[18], "... la investigación, ajuste y resolución de

---

[18] 26 LPRA Sec. 2716b.

cualquier reclamación se hará en el período razonablemente más corto dentro de noventa (90) días después de haberse sometido al asegurador la reclamación" y que, "... [e]n el caso de que un asegurador no pueda resolver una reclamación en el término establecido en el inciso (1) de esta sección, deberá mantener sus expedientes los documentos que acrediten la existencia de justa causa para exceder el término anteriormente dispuesto". No hay determinación alguna en el expediente de que la parte apelante no acreditó la existencia de justa causa.

En el caso *Com. Seguros P.R. v. Gen. Accident Ins. Co.*, 132 DPR 543, 552 (1993), nuestra última instancia judicial al interpretar el precitado articulado resolvió que dicho término comienza a correr a partir del momento cuando se presenta la reclamación.

Por su parte, el Artículo 27.162 dispone:

(1)   La investigación, ajuste y resolución de cualquier reclamación se hará en el período razonablemente más corto dentro de los primeros cuarenta y cinco (45) días después de haberse sometido al asegurador todos los documentos que fueren necesarios para disponer de dicha reclamación. Sólo cuando medien causas extraordinarias se podrá extender ese primer período, pero tal extensión nunca podrá exceder el término de noventa (90) días desde la fecha en que se sometió la reclamación. En aquellos casos en que el asegurador necesite un término adicional a los noventa (90) días, deberá así solicitarse por escrito al Comisionado veinte (20) días antes del vencimiento de dichos noventa (90) días, debiendo también notificarse de ello al reclamante. Si el Comisionado entendiera que la solicitud de tiempo adicional es irrazonable, sea porque la misma no está debidamente justificada o el tiempo adicional es excesivo, le notificará al asegurador que no procede dicha prórroga y que, por tanto, deberá disponer de la reclamación en el término reglamentario o dentro del término adicional que en dicha notificación se le concediera.

(2) El Comisionado en cualquier momento podrá requerir el ajuste y resolución inmediata de cualquier reclamación si considera que se está dilatando o retrasando indebida e injustificadamente la misma. (Subrayados nuestros).

Con el propósito de establecer el parámetro de distinción entre lo que constituye una reclamación dentro del contexto del Artículo

27.162 del Código de Seguros de Puerto Rico y un aviso de pérdida esta Oficina ha establecido que deberán concurrir los siguientes cuatro elementos para que se constituya una reclamación que: 1) haya una notificación por escrito; 2) la notificación sea hecha por un reclamante al asegurador o a su representante; 3) se señalen los hechos pertinentes a su reclamación; 4) se alegue tener derecho al pago o se reclame un daño compensable. Conforme a lo anterior, es pues la distinción principal entre una reclamación y un aviso de pérdida el que, además de señalarse los hechos pertinentes, se alegue el derecho al pago por el reclamante o se reclame por un daño compensable.

Por otro lado, la parte apelante razona que, incidió el foro *a quo* al concluir que su trato fue injusto, carente de razonabilidad, que forzó al Consejo a presentar la demanda, y que no cumplió con sus obligaciones al amparo de la póliza y el Código de Seguros, y que entabló una defensa hostil y al no considerar sus objeciones específicas de al informe del Comisionado Especial. Asimismo, la parte apelante sostiene, en su *primer* y *segundo* señalamiento de error que, incidió el Tribunal de Primera Instancia al incluir en su *Sentencia* honorarios de abogados e intereses por mora.

Por estar intrínsecamente relacionados, se discutirán los señalamientos de error antes mencionados de manera conjunta.

Tal y como lo dicta el derecho previamente esbozado, la regla 44.1(d) de Procedimiento Civil, supra, provee lo pertinente a la imposición de honorarios de abogados, precedida de una determinación de temeridad. Como sabemos, en nuestro ordenamiento jurídico la *temeridad* se define como aquella conducta que hace necesario un pleito que se pudo evitar, que lo prolonga innecesariamente o que obliga que la otra parte incurra en gestiones evitables. Es decir, "[l]a temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la

administración de la justicia". Ahora, si bien es cierto que la determinación sobre si una parte ha procedido con temeridad descansa en la sana discreción del tribunal sentenciador, nuestra Alta Curia ha señalado que, no procede en todos los casos. Depende, pues, de la determinación discrecional que haga el tribunal en torno a si la parte perdidosa o su abogado, actuaron con temeridad o frivolidad, o de la existencia de una ley especial que ordene la imposición de los honorarios.

Nuestra última instancia judicial, a manera de ejemplo, ha reseñado que una parte es temeraria cuando insiste en alegar algo sin alguna prueba fehaciente, niega los hechos que le constan o son de fácil corroboración y dilata los procedimientos judiciales para no responder por sus obligaciones. *González Ramos v. Pacheco Romero*, 209 DPR 138, 149-150 (2022). Se trata de una actitud que afecta el buen funcionamiento y la administración de la justicia, que sujeta al litigante inocente a una innecesaria ordalía judicial. *Fernández v. San Juan Cement Co. Inc.,* 118 DPR 713, 718 (1987).

No obstante, no existe temeridad "en aquellos casos en que el litigante actúa de acuerdo a la *apreciación errónea de una cuestión de derecho y no hay precedentes establecidos sobre la cuestión* [...] o cuando existe alguna desavenencia honesta en cuanto a quién favorece el derecho aplicable a los hechos del caso". *Oliveras, Inc. v. Universal Ins. Co.*, 141 DPR 900, 936 (1996) (citas omitidas).

Es preciso puntualizar que, el caso de marras versa sobre una reclamación compleja, toda vez que, envuelve en sí misma múltiples reclamaciones. Tal y como se desprende de la cuarta determinación de hecho de la Sentencia apelada, el Condominio Villas del Mar Beach Resort consiste en **10 edificios de 3 y/o 4 pisos cada uno**, tipo "walk-up" con un total de **227 unidades de apartamentos** residenciales. Entre los remedios solicitados, la parte demandante reclamó que se le ordenara a la parte apelante a pagar la cantidad

aproximada de $12,500,000.00 como compensación por los daños sufridos en el Condominio Villas Del Mar Beach Resort, como resultado del paso del huracán María por Puerto Rico el 20 de septiembre de 2017.

Habida cuenta de la complejidad de la reclamación, el foro primario tuvo a bien designar un Comisionado Especial. En la *Orden de Nombramiento y Encomienda de Comisionado Especial* del 2 de junio de 2023, foro *a quo* consignó que en consideración a los aspectos técnicos y especializados que plantea la adjudicación de las controversias del presente caso, resultaba necesaria la designación de un Comisionado Especial, y en su consecuencia, y a tenor con las Reglas 41.1 y 41.2 del Procedimiento Civil, *supra*, se designó al Sr. Luis Esteves como Comisionado Especial en el caso.

Se desprende del expediente ante nos que durante la tramitación del pleito han surgido controversias genuinas en torno al ajuste y valoración de la pérdida. De hecho, surge del tracto procesal del caso y fue recogido en la propia *Sentencia* apelada, que luego de que el Comisionado rindiera su Informe, el 5 de noviembre de 2025, el foro primario celebró una Vista Argumentativa, en la que, tras escuchar los argumentos de las partes, le ordenó al Comisionado ajustar dicha pérdida al 2025. Lo anterior, a juicio nuestro, en contravención a las cláusulas claras y libres de ambigüedad contenidas en la Póliza. Nuestro Alto Foro ha reconocido que no existe temeridad cuando ha existido una controversia material que impide adjudicar la controversia del ajuste.[19]

---

[19] En *Consejo de Tit. Cond. Playa Azul II v. MAPFRE PRAICO Insurance Co.*, supra, la Alta Curia señaló que la postura de Mapfre durante la tramitación de la reclamación por el ajuste caía dentro de estas conductas no temerarias, al sostener ante el Tribunal de Primera Instancia que existía una controversia material que impedía adjudicar la controversia del ajuste y presentar sus argumentos en derecho para sostener que no procedía el pago de esta suma.

Suponer que una reclamación de esta naturaleza es susceptible de ser resuelta en el término de 90 días, cuando existen controversias en cuanto a la valoración y el ajuste no es una expectativa razonable. Tampoco podemos pasar por alto que el trámite procesal se interrumpió en varias ocasiones, entre ellas, las órdenes de paralización emitidas por el Alto Foro, la paralización debido a procesos ante este foro revisor intermedio y el trámite relacionado al nombramiento y ejecución de las encomiendas del Comisionado Especial, entre otras.

Conforme al derecho previamente reseñado, colegimos que incidió el foro primario al determinar que en el caso que nos ocupa la parte apelante incurrió en temeridad y consecuentemente, imponerle una suma irrazonable de honorarios de abogado. Aunque como dijimos, la determinación de temeridad constituye un ejercicio discrecional del Tribunal de Primera Instancia, en esta ocasión, colegimos que, ante las particularidades de este caso, medió abuso de discreción. En consonancia con lo anteriormente discutido, colegimos que tampoco están presentes las circunstancias que justifique la imposición de intereses por mora. En consecuencia, colegimos que, en efecto, se cometieron los errores señalados.

**IV**

Por los fundamentos que anteceden, se revoca la *Sentencia* apelada y se devuelve el caso al foro primario para la continuación de los procedimientos, específicamente, para que efectúe la valoración de los daños reclamados por la parte apelada, de conformidad con lo dispuesto en la Póliza de seguro contratada por las partes. Asimismo, se eliminan las cuantías impuestas por concepto de honorarios de abogado por temeridad y el pago de intereses por mora.

Notifíquese.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones. El Juez Pagán Ocasio disiente, respetuosamente de la determinación tomada por la mayoría del panel. La determinación tomada por el Comisionado Especial y acogida por el Tribunal de Primera Instancia, es conforme a derecho. Por lo cual, este foro no debe intervenir con la misma. En su lugar, procede confirmar la Sentencia apelada.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones